# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-12-00582-CR

**Candelario Cerda, Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE DISTRICT COURT OF CALDWELL COUNTY, 421ST JUDICIAL DISTRICT
NO. 2010-082, THE HONORABLE TODD A. BLOMERTH, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Candelario Cerda of two counts of sexual assault of a child and for each count assessed his punishment at confinement for ten years in the Texas Department of Criminal Justice and a $5,000 fine. *See* Tex. Penal Code § 22.011(a)(2)(A). The trial court imposed sentence in accordance with the jury's verdict and ordered the sentences to be served consecutively. *See id.* § 3.03(b)(2)(A); Tex. Code Crim. Proc. art. 42.08. In five points of error on appeal, appellant complains about the admission of "backdoor" hearsay evidence, the exclusion of impeachment evidence, the trial court's failure to conduct a hearing outside the presence of the jury to determine the admissibility of extraneous-offense evidence, the denial of his right to present a meaningful defense, and the insufficiency of the evidence to support his convictions. We find no reversible error. However, through our own review of the record, we have found non-reversible error

in the written judgments of conviction. We will modify the judgments to correct the clerical errors and, as modified, affirm the judgments.

## BACKGROUND

V.R. testified that she knew appellant through church, where he was a worship leader. When she was 15 years old, she exchanged phone numbers with appellant at a church member's funeral. Subsequently, they began texting and talking with each other frequently. In one of their conversations, appellant asked V.R. if she would have sex with him. She refused because he went to her church and was 25 years old. Appellant assured her that no one would know. One week after the funeral, appellant asked V.R. to meet him at an H.E.B. grocery store near her house. V.R. snuck out of her house while her parents were asleep and met him as he had asked. Appellant picked V.R. up in his black pickup truck and told her that they were going to his friend's house to watch a movie. Instead, however, he drove her to a vacant lot.

Appellant parked the truck at the lot and told V.R. to get in the back seat, take off her clothes, and lie down. As she complied, appellant put sun shades up to cover all the windows, then moved to the back seat and removed his clothes. He took a towel from under the seat and placed it on the seat underneath V.R. He then put his fingers inside her vagina. Appellant next directed V.R. to get on her hands and knees. After she complied, he put his penis inside her vagina. At this point, V.R. told appellant to stop but he did not. According to V.R.'s testimony, he only stopped when he noticed blood coming from her vagina. He gave her paper towels to wipe herself and then told her to get dressed. Appellant put his clothes back on and got back in the front seat. He told V.R. to stay on the floor of the backseat while he drove her home. He dropped her off at a church near her house.

2

However, V.R. was afraid to go home. Instead, she walked around town. At some point, she encountered a boy she knew as "Jeremiah," who was a friend of one of her brothers. She borrowed his phone to call her mother but hung up before her mother answered because she got scared. V.R. testified that Jeremiah asked her to have sex with him but she said no. The two then smoked marijuana together. At some point, V.R. saw a knife sticking out from Jeremiah's pocket, became scared, and ran off without returning Jeremiah's phone. Afterwards, as she was walking, she saw one of her brothers outside a nearby store. Her brother picked her up and drove her home. Once at home, V.R. eventually told her dad that "[appellant] raped [her]."

F.F. met appellant at church when she was 12 years old. When she was 14, she and appellant began talking on the phone. Appellant began asking F.F. to sneak out of her home at night, which she did. He would pick her up in his truck. F.F. testified that her relationship with appellant became "physical"—meaning sexual—when she was 15 years old. She described multiple occasions on which she and appellant engaged in sexual activities; she stated that their sexual relationship lasted nine or ten months. F.F. also testified about two incidents in which she was with appellant parked in his truck and they were discovered by police: one at a park where they were "just talking" (before their relationship had become sexual) and another at a parking garage at Texas State University where they were both undressed and about to have sex. F.F. described having sex with appellant at a Motel 6 in San Marcos, in his truck at multiple locations, and in a storage building at church. Her testimony reflected that on numerous occasions appellant had anal sex, vaginal sex, and oral sex with her. He also penetrated her digitally on repeated occasions, including one time when

3

he attempted to put his entire fist into her vagina, causing her to bleed. F.F. disclosed appellant's conduct with her after V.R. revealed appellant's sexual assault of her.

The State charged appellant with two counts of sexual assault of a child, one count relating to each girl. A jury found appellant guilt of sexually assaulting both girls and for each count assessed a ten-year sentence and a $5,000 fine. The trial court sentenced appellant in accordance with the jury's verdicts, ordering the sentences to run consecutively. This appeal followed.

## DISCUSSION

### Backdoor Hearsay

At trial, Melissa Rodriguez, a forensic interviewer with the children's advocacy center, testified about the demeanor of V.R. and F.F. during their forensic interviews as well as the fact that both girls were enrolled in counseling at the advocacy center. Also at trial, V.R.'s father testified about what he did after his daughter told him about what had happened. In his first point of error, appellant complains that the trial court erred by allowing this testimony because it constituted inadmissible "backdoor" hearsay.

Hearsay is a statement, other than one made by the declarant while testifying at a trial, offered in evidence to prove the truth of the matter asserted. Tex. R. Evid. 801(d). Hearsay is generally inadmissible except as provided by the rules of evidence or statute. Tex. R. Evid. 802. The hearsay prohibition cannot be circumvented by eliciting the substance of the statement in indirect form. *Schaffer v. State*, 777 S.W.2d 111, 113 (Tex. Crim. App. 1989). If the content of a statement is presented by implication, such "backdoor hearsay" is subject to the same rules and limitations as the more common form of hearsay. *Gilbert v. State*, 874 S.W.2d 290, 295 (Tex.

4

App.—Houston [1st Dist.] 1994, pet. ref'd) (citing *Schaffer*, 777 S.W.2d at 113). Whether testimony violates the hearsay prohibition necessarily turns on how strongly the content of an out-of-court statement can be inferred from the context; the question is whether the strength of the inference produces an "inescapable conclusion" that the evidence is being offered to prove the substance of an out-of-court statement. *Head v. State*, 4 S.W.3d 258, 261–62 (Tex. Crim. App. 1999). "An analysis of whether the impermissible inference is so overriding as to fall within the hearsay prohibition will necessarily turn on the specific factual circumstances of a given case." *Id.* at 262 n.4.

Appellant argues that the complained-of testimony contained strong inferences about the truthfulness of the outcry statements of the girls and thus was "backdoor" hearsay. However, hearsay by inference, or backdoor hearsay, violates the prohibition against hearsay because it presents the content or substance, indirectly, of the out-of-court statement. Here, the complained-of testimony did not convey the content of the girls' out-of-court statements, even by implication. Rodriguez did not give any specifics about the girls' comments during the forensic interviews; she simply described her observations of the girls during their interviews.[1] These personal observations

---

[1] We note that the prosecutor asked Rodriguez, "Can you describe [F.F.]'s demeanor during this interview?" She responded, "Yes," and then proceeded to describe F.F.'s demeanor. Only after she completed her answer did appellant object. Because appellant waited until the question calling for the purportedly objectionable response had been asked and answered before he objected, his objection was untimely and his complaint about the admission of Rodriguez's testimony about F.F.'s demeanor has not been preserved for appellate review. *See* Tex. R. App. P. 33.1(a)(1); *see also Pena v. State*, 353 S.W.3d 797, 807 (Tex. Crim. App. 2011) (objection is timely if made at earliest opportunity or as soon as grounds for objection become apparent); *Saldano v. State*, 70 S.W.3d 873, 889 (Tex. Crim. App. 2002) ("[T]he failure to object in a timely and specific manner during trial forfeits complaints about the admissibility of evidence.").

conveyed her perception of how the girls felt emotionally during the interview; they did not convey the contents of any statements made during the interview. The fact that V.R. "seemed nervous" or that F.F. "was pretty upset" in no way conveyed their descriptions of the acts of sexual abuse appellant perpetrated against them. Nor does the fact that the girls were in counseling convey the content of any out-of-court statement describing sexual abuse.

Similarly, V.R.'s father did not convey any specifics about what his daughter told him.[2] Rather, his testimony merely described the actions he took after talking to her. The prohibition against backdoor hearsay does not prohibit a witness from testifying about actions he took in response to an out-of-court statement, but only from detailing the contents of the statement when doing so. *See, e.g.*, *Schaffer*, 777 S.W.2d at 114–15 (holding it was permissible for police officer to testify that officer was acting in response to "information received," but officer was not permitted to relate historical aspects of case, which were replete with hearsay statements); *see also Dunbar v. State*, No. 03-12-00315-CR, 2014 WL 2741237, at *5 (Tex. App.—Austin June 13, 2014, no. pet. h.) (mem. op., not designated for publication) ("Witnesses are generally allowed to explain that an out-of-court statement caused the witness to take a particular action so long as the testimony does not strongly imply the content of the out-of-court statement.").

The test for backdoor hearsay is whether the "'State's *sole intent* in pursuing [a] line of questioning was to convey to the jury' the contents of out-of-court statements." *Head*, 4 S.W.3d

---

[2] V.R.'s father answered affirmatively when the prosecutor asked, "Okay. Did, at some point, [V.R.] open up to you about what had happened?" Appellant neither objected to this question nor the answer. Appellant objected to the next question about whether V.R. "[made] an outcry to [him]," which the trial court sustained. The prosecutor then asked V.R.'s father, "What did you do next?"

at 262 (quoting *Schaffer*, 777 S.W.2d at 114). Because the content of the girls' out-of-court statements were not impliedly presented in the testimony of the forensic interviewer or V.R.'s father, we are unable to conclude from the record that the State's sole intent in offering the complained-of testimony was to convey the content or substance of any of the girls' out-of-court statements. *See id.* (concluding that trial court could have reasonably determined that State's intent in questioning witness was not solely to convey out-of-court statement). Accordingly, the trial court did not abuse its discretion in allowing the complained-of testimony. *See Gurka v. State*, 82 S.W.3d 416, 421 (Tex. App.—Austin 2002, pet. ref'd) (trial court's decision to admit testimony objected to on basis of backdoor hearsay is subject to abuse-of-discretion standard); *Head*, 4 S.W.3d at 262 n.4 (review of trial court's decision to allow disputed testimony is tempered by general rule that trial judge's evidentiary ruling on hearsay objection will be upheld absent abuse of discretion). We overrule appellant's first point of error.

### Impeachment Evidence

As evidence of the previous and subsequent relationship between appellant and F.F., *see* Tex. Code Crim. Proc. art. 38.37(b)(2), the State offered evidence of an incident when appellant and F.F. were discovered by police parked in appellant's truck in a university garage on the Texas State University campus. Upon discovery, appellant attempted to flee the scene in his truck but was apprehended and arrested for evading detention.

Jesus Balderama, a senior patrol officer with the Texas State University campus police, testified about the encounter with appellant. He stated that he discovered appellant's truck in one of the university's parking garages at approximately 1:30 a.m. with the engine running and

7

sun shades covering all the windows. The officer described his failed attempts to make contact with the occupants of the truck and the ensuing chase when appellant drove off. He testified that as he was pursuing appellant's truck, he noticed someone running from the truck and advised his dispatcher of the situation. He explained that he did not actually see the person jump out of the truck but did notice someone running from it.[3]

   During cross-examination, appellant's counsel questioned Officer Balderama about the fleeing figure. He asked the officer to describe "the image that you say you saw exit the car and for how long you saw that image." The officer responded that he "saw that image for a brief 30 seconds, if that." Counsel later asked the officer how long the fleeing figure was on the dash-cam video from his patrol car. Officer Balderama responded, "Like I said, give or take a couple of seconds, 20, 30 seconds." Appellant's counsel persisted, asking, "A couple of seconds or 20, 30?" The officer repeated the time frame of "30, 20, 30 seconds." Counsel then announced his desire "to impeach this witness by letting him see his video." At the ensuing bench conference, appellant's counsel indicated that he wanted the officer to refresh his recollection with the video "or else [he was] going to impeach him with it, one or the other." Counsel asserted that "the figure, whoever it was, wasn't visible on his dash cam for more than three seconds, flat."[4] The trial court declined to allow appellant's counsel to impeach the officer in this manner.

_____

   [3] Subsequent testimony from F.F. revealed that she was the person who fled from appellant's truck that night. Her testimony also established that she and appellant were undressed and about to engage in sexual activity in the truck when discovered by the police.

   [4] In his brief, appellant asserts that the figure appeared on the dash-cam video for "3-5 seconds of obscured view." Appellant failed to offer the video into evidence, so it is not part of the appellate record and is unavailable for review.

In his second point of error, appellant asserts that the trial court erred by not allowing his counsel to impeach Officer Balderama by showing the dash-cam video of appellant's evading-detention arrest. He contends that he was entitled to impeach the general credibility of the officer by use of such evidence. We disagree.

As a general rule, a party is not entitled to impeach a witness on a collateral or immaterial matter. *Ramirez v. State*, 802 S.W.2d 674, 675 (Tex. Crim. App. 1990); *Poole v. State*, 974 S.W.2d 892, 905 (Tex. App.—Austin 1998, pet. ref'd). A collateral matter is one which seeks only to test a witness's general credibility or relates to facts irrelevant to issues at trial. *Keller v. State*, 662 S.W.2d 362, 365 (Tex. Crim. App. 1984); *Delamora v. State*, 128 S.W.3d 344, 363 (Tex. App.—Austin 2004, pet. ref'd). "The test as to whether a matter is collateral is whether the cross-examining party would be entitled to prove it as a part of his case tending to establish his plea." *Ramirez*, 802 S.W.2d at 675 (quoting *Bates v. State*, 587 S.W.2d 121, 133 (Tex. Crim. App. 1979)); *see Hayden v. State*, 296 S.W.3d 549, 554 (Tex. Crim. App. 2009). Here, the evidence sought to be introduced by appellant bears no relationship to any contested issue in the sexual-assault trial. How long the fleeing figure was shown on the dash-cam video was not evidence that appellant could have relied on in his case-in-chief to show that he had not sexually assaulted F.F. Thus, whether Officer Balderama was accurate as to the precise amount of time that the fleeing figure appeared on the dash-cam video was a collateral matter.

Furthermore, a party may not cross-examine a witness on a collateral matter and then contradict the witness's answer. *Delamora*, 128 S.W.3d at 363; *see Shipman v. State*, 604 S.W.2d 182, 184–85 (Tex. Crim. App. 1980). By repeatedly asking Officer Balderama how

9

long the fleeing figure appeared on the dash-cam video, appellant's counsel elicited a response from the officer for the sole purpose of introducing extraneous evidence to contradict the officer's response and place the officer's own character into issue. Such questioning was improper. *See Hammett v. State*, 713 S.W.2d 102, 105 (Tex. Crim. App. 1986) (party may not "bootstrap" its way to impeachment by eliciting offending statement on cross-examination).

As a collateral matter—not relating to appellant's claim that he was not guilty of sexually assaulting F.F. but merely serving to contradict Officer Balderama on facts irrelevant to issues at trial—the amount of time the fleeing figure appeared on video was inadmissible impeachment evidence. As such, the trial court did not err by refusing to allow appellant to impeach Officer Balderama with the dash-cam video. We overrule appellant's second point of error.

### Extraneous-Offense Evidence

During the State's rebuttal case, Todd Harrison, a patrol officer with the San Marcos Police Department, testified about an incident in which he encountered appellant and 14-year-old F.F. parked in appellant's truck in one of the city parks after hours, at around 2:30 in the morning. In his third point of error, appellant asserts that the trial court erred in allowing this testimony without first conducting a hearing outside the presence of the jury to determine its admissibility.

Preservation of error is a systemic requirement on appeal. *Blackshear v. State*, 385 S.W.3d 589, 590 (Tex. Crim. App. 2012) (citing *Ford v. State*, 305 S.W.3d 530, 532 (Tex. Crim. App. 2009)). A reviewing court should not address the merits of an issue that has not been preserved for appeal. *Wilson v. State*, 311 S.W.3d 452, 473–74 (Tex. Crim. App. 2010). To preserve a complaint for appellate review, a party must have presented to the trial court a timely request,

10

objection, or motion that states the specific grounds for the desired ruling if they are not apparent from the context of the request, objection, or motion. Tex. R. App. P. 33.1(a)(1); *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012). An objection is timely if made at the earliest opportunity or as soon as the grounds for the objection become apparent. *Pena v. State*, 353 S.W.3d 797, 807 (Tex. Crim. App. 2011); *Sandoval v. State*, 409 S.W.3d 259, 306 (Tex. App.—Austin 2013, no pet.). If a defendant fails to object until after an objectionable question has been asked and answered, and he can show no legitimate reason to justify the delay, his objection is untimely, and any claim of error is forfeited. *Luna v. State*, 268 S.W.3d 594, 604 (Tex. Crim. App. 2008); *Sandoval*, 409 S.W.3d at 306.

Here, appellant objected to the extraneous-conduct evidence and requested a hearing outside the presence of the jury only after the officer had already testified about the encounter rather than when the prosecutor began eliciting the details of the encounter. Thus, appellant's objection and request for a hearing were untimely. Appellant's late objection and untimely request did not preserve his complaint as to the admission of the officer's testimony. *See Saldano v. State*, 70 S.W.3d 873, 889 (Tex. Crim. App. 2002) ("[T]he failure to object in a timely and specific manner during trial forfeits complaints about the admissibility of evidence."). Accordingly, we overrule appellant's third point of error.

**Right to Present Defense**

In his fourth point of error, appellant asserts that the trial court's evidentiary rulings violated his right to present a complete and meaningful defense. As best as we can discern, appellant complains about the exclusion of the following:

11

- evidence of a potential alternative perpetrator for V.R.'s sexual assault,

- evidence of a potential alternative perpetrator for F.F.'s sexual assault,

- F.F.'s medical records from her stay in a psychiatric hospital,

- testimony demonstrating the detective's "shoddy investigation,"

- evidence of V.R.'s juvenile record,

- a DPS lab report,

- testimony about V.R.'s dating history,

- evidence of F.F.'s pregnancy at the time of the SANE exam,

- opinion testimony regarding F.F.'s truthfulness and unreliability as a witness,

- testimony about a purported prior false allegation of sexual assault made by F.F.,

- the detective's arrest warrant affidavit concerning the sexual assault of V.R., and

- rebuttal testimony from the SANE nurse who examined V.R.

As noted in the discussion of the previous point of error, preservation of error is a systemic requirement on appeal. *Blackshear*, 385 S.W.3d at 590. An appellate issue involving a proffer of evidence, as opposed to an objection, must still satisfy the preservation-of-error requirements. *Reyna v. State*, 168 S.W.3d 173, 179 (Tex. Crim. App. 2005) (stating that purpose of requiring objection is to give trial court or opposing party opportunity to correct error or remove basis for objection and reasoning that "[a]though this case involves a proffer of evidence rather than an objection, the same rationale applies"). To preserve a complaint regarding the exclusion of evidence, a party must not only tell the judge that the evidence is admissible, but must also explain

12

why it is admissible. *Id.* at 177–79. Further, the explanation given at trial must match the one urged on appeal. *Id.* at 179.

As to the excluded evidence about which appellant complains in this point of error, appellant objected only that he was "denied the opportunity to properly defend" in connection with the exclusion of F.F.'s medical records from the psychiatric hospital. With all the other rulings related to the complained-of exclusion of evidence, appellant neither objected to the exclusion on the ground, nor offered the evidence on the basis, that his right to present a meaningful defense was compromised. While the right to present a meaningful defense is rooted in constitutional protections, even constitutional rights may be waived if the proper request, objection, or motion is not asserted in the trial court. *Saldano*, 70 S.W.3d at 886–87; *see Mendez v. State*, 138 S.W.3d 334, 342 (Tex. Crim. App. 2004). If a party fails to properly object to constitutional errors at trial, these errors can be forfeited. *Clark*, 365 S.W.3d at 339; *Briggs v. State*, 789 S.W.2d 918, 924 (Tex. Crim. App. 1990). Because appellant did not articulate that his right to present a meaningful defense supported the admission of the complained-of excluded evidence (other than F.F.'s medical records from the psychiatric hospital), the trial court never had the opportunity to rule on this rationale. Accordingly, appellant did not preserve his complaint that the trial court's evidentiary rulings excluding the complained-of evidence (other than F.F.'s medical records from the psychiatric hospital) violated his right to present a proper defense.

As to the medical records from F.F.'s hospitalization in a psychiatric hospital, appellant sought to offer these records to attack F.F.'s reliability and credibility. However, during cross-examination of F.F., appellant elicited testimony about F.F.'s mental-health issues, including

the fact that she engaged in self-harming behavior (cutting herself), heard voices (demon voices telling her to kill herself), had visual hallucinations (red and green eyes on the bathroom window that watched her take showers), thought her father had been possessed by demons on three occasions (and saw him levitate on one such occasion), and had suicidal ideation (including specific plans for killing herself). F.F. also admitted that when she was in the psychiatric hospital she denied being sexually abused, even though her hospital stay was after appellant began engaging in sexual activity with her. Later, on further cross-examination, F.F. acknowledged that she was not taking the medications prescribed to her to address her visual and auditory hallucinations.

In addition, appellant called a psychologist to testify as an expert on his behalf. Based on his review of F.F.'s hospital records, the doctor testified that F.F. was "suffering from psychotic symptoms" and "her GAF was quite low."[5] The two GAF scores F.F. was given, 20 and 15, reflected "extremely compromised" functioning. The doctor explained that a GAF score between 21 and 30, "which was a notch above what [F.F.] got," would reflect people who are actively delusional, having hallucinations, who would have serious impairment in their judgment or in their communication, and would be unable to function in most situations. Appellant's counsel also questioned his expert about the "risk that is associated when a psychotic stops taking his or her medication."

Thus, the record reflects that the evidence for which appellant sought admission of F.F.'s medical records was in fact presented to the jury by the defense. Appellant was able to attack F.F.'s credibility with evidence of her mental-health issues. Appellant's assertion that the exclusion

---

[5] The expert explained: "The GAF is an overall rating scale that mental health providers use, in order to try and make a very general assessment of the level of functioning of the individual. It runs from 0 to 100, with 100 being best, in ten-point increments."

14

of the medical records from the psychiatric hospital deprived him of "the opportunity to defend" is without merit. We overrule appellant's fourth point of error.[6]

## Sufficiency of the Evidence

In his final point of error, appellant challenges the sufficiency of the evidence to support his convictions for sexual assault of a child.

---

[6] Additionally, we observe that appellant's brief misstates some of the complained-of rulings of the trial court and the purported exclusion of evidence. For example, appellant states in his brief that his counsel was not permitted to attack F.F.'s reputation for truthfulness through defense witness Laura Cerda. However, the record reflects that counsel explicitly asked Ms. Cerda, "What was [F.F.]'s reputation in the community for truthfulness?" She answered the question, uninterrupted and without objection from the State. It was only to the subsequent questioning concerning a "false rape claim" that the State objected. In the ensuing proffer outside the presence of the jury, appellant wholly failed to make any showing of the falsity of the prior allegations. *See Lopez v. State*, 18 S.W.3d 220, 225–26 (Tex. Crim. App. 2000) (for prior accusations to have probative value in impeaching witness's credibility in sexual-assault case, party must show accusations were false and similar to current accusation). Accordingly, as to that line of questioning, the trial court ruled, "This testimony is not coming in, and the jury will be instructed to disregard it in its entirety." Appellant's characterization of that trial-court ruling as excluding testimony from his witness about F.F.'s reputation for truthfulness is inaccurate.

Also in his brief, appellant claims that his counsel was prevented from questioning Detective Nichols about the impropriety of two complaining witnesses meeting to collaborate. Yet, the record demonstrates otherwise. During cross-examination of the detective, appellant's counsel asked the detective, "Is it good police practice in your jurisdiction to allow two witnesses to get together and compare their stories before they would come to you and give a second statement?" After the court overruled the State's relevance objection, the detective answered, "Not if they are known witnesses, no." Counsel later asked, "Is it good practice, then, to allow a complaining witness and a — somebody who had been implicated as a potential complaining witness — to allow them to get together during the course of your investigation before you take an official statement from the second one?" Detective Nichols answered, "If they are in my control, no, it's not good practice."

Because we resolve this point of error on the basis of procedural default (as to the purportedly excluded evidence other than F.F.'s medical records) and do not address the substance of appellant's complaint (except as to the exclusion of F.F.'s medical records), we need not address these and other incorrect descriptions of the record.

Due process requires that the State prove, beyond a reasonable doubt, every element of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 313 (1979); *Rabb v. State*, --- S.W.3d ---, No. PD-1643-12, 2014 WL 2865698, at *2 (Tex. Crim. App. June 25, 2014). When reviewing the sufficiency of the evidence to support a conviction, we consider all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Rabb*, 2014 WL 2865698, at *2; *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010). We review all the evidence in the light most favorable to the verdict and assume that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *Jackson*, 443 U.S. at 318; *see Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). We consider only whether the jury reached a rational decision. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010) ("Our role on appeal is restricted to guarding against the rare occurrence when a factfinder does not act rationally.") (quoting *Laster*, 275 S.W.3d at 518).

In his brief, appellant argues that the evidence is insufficient to support his conviction for sexually assaulting V.R. because there was "no physical evidence to corroborate [V.R.'s] story," there is no corroborating DNA evidence, appellant's mother and sister provided a "solid alibi," the investigating detective was "not credible," and there were inconsistencies in witness testimony. He argues that the evidence is insufficient to support his conviction for sexually assaulting F.F. because F.F.'s accusation was "not supported by independent evidence," F.F. came forward only after talking to V.R. and discovering that the two girls had similar stories, there was "no DNA corroboration," appellant's mother and sister explained how F.F. had knowledge of the contents of appellant's truck

16

(one of the alleged sites of sexual-assault incidents), F.F.'s story regarding one sexual assault incident was "neither plausible nor credible" and was "strongly disputed" by testimony of defense witnesses, F.F. was not a reliable witness because she was afflicted with psychological issues, and there were omissions and inconsistencies in F.F.'s testimony.

However, the jury, as exclusive judge of the facts, is entitled to weigh and resolve conflicts in the evidence and draw reasonable inferences therefrom. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *see* Tex. Code Crim. Proc. arts. 36.13, 38.04. The jury is also free to accept or reject any or all of the evidence presented by either side. *See Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008); *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000). Thus, when the record supports conflicting inferences, we must presume that the trier of fact resolved any such conflicts in favor of the verdict and defer to that resolution. *Jackson*, 443 U.S. at 326; *Anderson v. State*, 416 S.W.3d 884, 888 (Tex. Crim. App. 2013).

V.R. testified that on the night in question she was 15 years old and, at appellant's direction, snuck out of her house while her parents were asleep. Appellant picked her up behind an H.E.B. grocery store near her house. He drove her to a vacant lot, where he parked his truck and put multiple sun screens up to cover all the truck windows. He told V.R. to get in the back seat. When she complied he told her, in a "kind of mean" voice, to remove her clothes. Again, she complied thinking that "something bad was going to happen to [her]." Appellant then moved to the back seat and took his clothes off. He told V.R. to lay down and took a towel from under the seat, placing it on the back seat under V.R.'s bottom. V.R. testified that appellant then "put his hand in [her] vagina." She stated that "[i]t hurt" when he put his fingers in the "inside part of [her] vagina."

17

Appellant then instructed V.R. to get on her hands and knees. Once again, V.R. complied. According to V.R., appellant then "stuck his penis in [her]," "in [her] vagina." She described feeling his chest against her body as he "kept going back and forth" and indicated that "[i]t hurt really bad." At that point, V.R. told appellant to stop, but he did not. She testified that appellant later "stopped on his own because he was seeing blood" coming from her vagina. Appellant then gave V.R. paper towels to wipe herself with. As he did so, he told V.R. to go home and take a shower. When V.R. cleaned herself with the paper towels she saw her blood on them. V.R. testified that afterwards "that part of [her] body . . . hurted" and she felt "confused." Appellant told her to put her clothes back on, and he put his own clothes back on. He then got back in the front seat, told V.R. to stay in the backseat on the floor, started the truck, and began driving. He dropped her off by a church near her house.

F.F. testified that appellant had engaged in sexual activity with her over a period of nine to ten months when she was 15 years old. She said that she had sex with appellant more than 100 times, describing the kinds of sex as "[o]ral, anal and the normal [meaning vaginal]." She described an incident when appellant took her to a Motel 6 in San Marcos and "put his fingers inside [her] . . . inside [her] vagina." She said that she told appellant to stop because he was hurting her and she was bleeding because "he was trying to put his whole fist inside [her]." F.F. said that they had sexual encounters in appellant's truck "a lot of times" and described an incident when appellant parked his truck in a Target parking lot in San Marcos, after hours, and put sun shades up to cover all the windows and "did [her] through the back," meaning he penetrated her anus with his penis. She testified that "it hurt" and said that she bled, as she did several times when they had anal

18

intercourse. She also described the lubricant appellant often used when they had anal intercourse. As to the indicted offense, F.F. testified about an incident in a church storage building during a church service. She said that she had gone to the storage to retrieve water for her mother. Appellant came into the storage building and told her to pull her pants down. Initially F.F. refused but appellant locked the door and told her "just to do it." She testified that she "did it real quick" and appellant "put his penis in [her] vagina." She recalled that he was not wearing a condom and "he comed inside" a cup.

Thus, both V.R. and F.F. described instances in which appellant penetrated their sexual organs with his sexual organ as alleged in the indictment. *See* Tex. Penal Code § 22.011(a)(2)(A). Both girls provided specific facts and sensory details when testifying about what happened, where it happened, and (in general terms) when it happened. Appellant's contention that the testimony of V.R. or F.F. is insufficient because it was uncorroborated is without merit. Because both girls were under 17 years of age at the time of these offenses, their testimony alone is sufficient to support appellant's conviction for these sexual assaults. *See* Tex. Code Crim. Proc. art. 38.07(a), (b)(1); *Perez v. State*, 113 S.W.3d 819, 838 (Tex. App.—Austin 2003, pet. ref'd), *overruled on other grounds by Taylor v. State*, 268 S.W.3d 571, 587 (Tex. Crim. App. 2008). Further, the State has no burden to produce any corroborating or physical evidence. *See Martines v. State*, 371 S.W.3d 232, 240 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *see also Lee v. State*, 176 S.W.3d 452, 458 (Tex. App.—Houston [1st Dist.] 2004) ("The lack of physical or forensic evidence is a factor for the jury to consider in weighing the evidence."), *aff'd*, 206 S.W.3d 620 (Tex. Crim. App. 2006).

Moreover, contrary to appellant's claim, there was corroborating evidence in this case. The sexual-assault examinations of both girls provided corroborating medical evidence. The sexual-assault nurse who examined V.R. approximately 19 hours after the assault noted trauma present in the genital exam of V.R. The nurse described acute injuries present in V.R.'s sexual organ—including bruising, tears, and swelling of the hymen—consistent with V.R.'s description of the sexual assault. The nurse also observed V.R. and noted that she had difficulty sitting because she was in pain. The clothing V.R. wore that night, recovered during the sexual-assault exam, had blood stains in the crotch area. Likewise, the sexual-assault nurse who examined F.F. noted trauma present in F.F.'s genital exam. The nurse observed several well-healed tears in F.F.'s hymen consistent with previous sexual activity. She opined that such injuries usually result from blunt force trauma. Also, phone records demonstrated that appellant communicated with the girls, texting and calling, during the time frame of the sexual assaults, just as the girls indicated. In addition, the girls' therapist described the common characteristics of victims of child sexual abuse and testified that both girls exhibited some of those behaviors. Also, the testimony of law-enforcement officers showed that appellant was discovered parked in his truck with F.F. on several occasions.[7]

In short, viewing the evidence in the light most favorable to the jury's verdict, we conclude that a rational trier of fact could have found the essential elements of these offenses beyond

---

[7] In addition, the testimony of V.R. and F.F. demonstrated that appellant engaged in similar conduct with both girls: sexual activity in his parked truck after covering the windows with sun screens and penetrating their sexual organs until they bled. Each girl's testimony helped corroborate that of the other.

a reasonable doubt. Accordingly, we overrule appellant's challenge to the sufficiency of the evidence in his final point of error.

## Clerical Error in Judgments

However, we observe that the judgments of conviction in this case contain clerical errors. Both judgments of conviction reflect that the "Statute for Offense" is "TPC 22.021(a)(2)(A)." However, section 22.021 of the Penal Code is the statute for aggravated sexual assault. The statute for sexual assault as alleged in the indictment in this case is section 22.011(a)(2)(A) of the Penal Code. This Court has authority to modify incorrect judgments when the necessary information is available to do so. *See* Tex. R. App. P. 46.2(b); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993). Accordingly, we modify each judgment of conviction to state that the "Statute for Offense" is "22.011(a)(2)(A) Penal Code."

## CONCLUSION

Having overruled all of appellant's points of error, we modify the trial court's judgments of conviction as noted above and affirm the judgments as modified.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Pemberton and Rose

Modified and, as Modified, Affirmed

Filed: August 22, 2014

Do Not Publish