# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-22-00641-CR

---

**Christopher Scott Koury, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE 26TH DISTRICT COURT OF WILLIAMSON COUNTY
NO. 20-0724-K26, THE HONORABLE DONNA GAYLE KING, JUDGE PRESIDING**

---

## O P I N I O N

Appellant Christopher Scott Koury was convicted by a jury of aggravated sexual assault of a child and sentenced by the trial court to thirty years' confinement. *See* Tex. Penal Code § 22.021(a)(1), (2)(B). On appeal, Koury contends that the trial court abused its discretion by admitting: (1) testimony from an unlicensed sexual assault nurse examiner (SANE), (2) testimony from an unreliable outcry witness, and (3) "backdoor hearsay" statements. We affirm the trial court's judgment of conviction.

## BACKGROUND

Koury was indicted for the aggravated sexual assault of his adopted daughter, Carol Williams.[1] He and his wife, Rainchild Singingwolf (Rain), are the adoptive parents of four

---

[1] Because Williams was a minor at the time of the offense, we will refer to her by a pseudonym in the interest of privacy. *See* Tex. R. App. P. 9.10(a)(3).

children, including Williams, whose biological parents left her with the couple when Williams was approximately eight years old. At trial, Van Caraway, Williams' half-brother and Rain's biological son, testified that while visiting him in March 2020, Williams, then sixteen, confided in him that Koury had "been touching [her] in [her] sleep." Caraway testified that Williams first disclosed the alleged abuse to him on the night of March 28, 2020. He testified that they spoke again at length the following day and that she told him that the abuse had begun when she was twelve years old, that Koury had touched and licked her vagina while she slept, and that there had been "many different instances."

Caraway also testified that after hearing the allegations, he made three phone calls—to the Williamson County Sheriff's Office (WCSO); to Child Protective Services (CPS); and to Rain. He further testified that he arranged for Williams to undergo a forensic interview and sexual assault forensic examination (SAFE).

SANE Allison DuBose testified that she performed the SAFE on March 30, 2020, and relayed statements made by Williams during the patient-history portion of the exam. DuBose testified that her nursing license had expired on February 28, 2020; that she learned of the lapse in July 2020; and that she was unlicensed at the time of Williams' SAFE. DuBose explained that on learning that her license had expired, she stopped working and submitted the necessary paperwork to the Board of Nursing, which "retroactively activated [her] license back with no penalties."

Eduardo Corona, a former forensic interviewer with the Williamson County Child Advocacy Center (CAC), testified about Williams' interview, which was conducted the same day as the SAFE. Corona defined the semi-structured narrative process and testified that Williams made an outcry; that she was able to provide specific details; and that she described the "position

of bodies," "movement," and "sensory details." On cross-examination, he testified that her demeanor during the interview was calm and that she was soft-spoken, matter-of-fact, and did not cry.

The State's remaining witnesses included Williams; WCSO Detective Johnny Guerra; and Julian Hernandez, a former WCSO forensics detective. The defense presented testimony from Koury; Rain; Dr. Benjamin Conforti, a therapist who saw both Williams and Rain; Nicole Harris, Rain's friend; Rain and Koury's children; Leslie Smith, an adoption worker; and several character witnesses.

The jury found Koury guilty of aggravated sexual assault of a child. Following a hearing on punishment, he was sentenced to thirty years' confinement. This appeal followed.

## DISCUSSION

### I. Standard of Review

We review a trial court's decision to admit evidence for an abuse of discretion. *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016); *see also Dabney v. State*, 492 S.W.3d 309, 316 (Tex. Crim. App. 2016). An abuse of discretion does not occur unless the trial court acts "arbitrarily or unreasonably" or "without reference to any guiding rules and principles." *State v. Hill*, 499 S.W.3d 853, 865 (Tex. Crim. App. 2016) (quoting *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990)). In other words, we may not reverse the trial court's ruling unless the "decision falls outside the zone of reasonable disagreement." *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016); *see also Henley*, 493 S.W.3d at 83. An evidentiary ruling will be upheld if it is correct on any theory of law applicable to the

case. *Henley*, 493 S.W.3d at 93 (citing *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009)).

## II. SANE Testimony

In his first issue, Koury contends that the trial court abused its discretion by admitting DuBose's testimony because she was unlicensed at the time of Williams' SAFE. Citing the Texas Occupations Code, he notes that a person "may not practice or offer to practice professional nursing or vocational nursing in this state unless the person is licensed" and that "[a] registered nurse who practices professional nursing or a vocational nurse who practices vocational nursing after the expiration of the nurse's license is an illegal practitioner whose license may be revoked or suspended." *See* Tex. Occ. Code §§ 301.251, .301(b); *see also id.* § 301.002(3) (defining "nurse" as "a person required to be licensed under this chapter to engage in professional or vocational nursing"). He argues that because DuBose "could not have legally done the exam, any information she obtained during the examination of [Williams] was obtained unlawfully and [was] therefore inadmissible as evidence" under Texas' exclusionary rule, codified in article 38.23(a) of the Texas Code of Criminal Procedure. *See* Tex. Code Crim. Proc. art. 38.23(a).

Article 38.23(a) provides:

> No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

*Id.*

4

For purposes of the article, "obtained" means that "evidence is acquired by planned action or effort, or, more specifically, by seizure." *Wehrenberg v. State*, 416 S.W.3d 458, 468 (Tex. Crim. App. 2013). The Court of Criminal Appeals has likewise interpreted the article to mean that evidence is obtained *in violation of the law* "only if there is some causal connection between the illegal conduct and the acquisition of evidence." *Id.* (citing *Roquemore v. State*, 60 S.W.3d 862, 870 (Tex. Crim. App. 2001); *State v. Daugherty*, 931 S.W.2d 268, 270 (Tex. Crim. App. 1996)).

Thus, not every violation of a law will invoke the rule. *Jackson v. State*, 968 S.W.2d 495, 499 (Tex. App.—Texarkana 1998, pet. ref'd) (citing *Roy v. State*, 608 S.W.2d 645, 651 (Tex. Crim. App. [Panel Op.] 1980)). Article 38.23(a)'s underlying purposes are "to protect a suspect's privacy, property, and liberty rights against overzealous law enforcement" and "to deter unlawful actions which violate the rights of criminal suspects in the acquisition of evidence for prosecution." *Wehrenberg*, 416 S.W.3d at 458–59; *see Carroll v. State*, 911 S.W.2d 210, 221 (Tex. App.—Austin 1995, no pet.) ("The primary purpose of the exclusionary statute is to deter unlawful actions which violate the rights of criminal suspects."). The rule may not be invoked for statutory violations unrelated to these purposes or to "the prevention of the illegal procurement of evidence of a crime." *Wehrenberg*, 416 S.W.3d at 459. Laws that will invoke the rule "are those that protect the rights and interests of citizens from infringement by the State." *Jackson*, 968 S.W.2d at 499.

Relatedly, the article does not give standing to raise a constitutional challenge when another's rights are violated, even in the context of article 38.23(a). *Neal v. State*, 256 S.W.3d 264, 284 (Tex. Crim. App. 2008); *Fuller v. State*, 829 S.W.2d 191, 201–02 (Tex. Crim. App. 1992), *overruled on other grounds by Riley v. State*, 889 S.W.2d 290, 301 (Tex.

5

Crim. App. 1993) (op. on reh'g)); *see Chavez v. State*, 9 S.W.3d 817, 819 (Tex. Crim. App. 2000) (holding that appellant lacked standing under article 38.23(a) to complain about seizure of evidence because it was not obtained in violation of *her* rights).

The State asserts that Koury failed to preserve this issue on appeal. To preserve a complaint for appellate review, there must ordinarily be a timely, specific objection and a ruling by the trial court. Tex. R. App. P. 33.1(a). However, article 38.23(a) "is not an independent basis for objecting to admission of evidence at trial, but rather is a procedural result which applies after an objection to the admission of evidence has been sustained." *Polk v. State*, 738 S.W.2d 274, 276 (Tex. Crim. App. 1987). A defendant need not specifically state the article in his objection to the admissibility of evidence to preserve error under the statute. *Id.* Rather, "[i]f the defendant invokes Texas law, either statutory or constitutional, as grounds for excluding evidence at trial, the provisions of Art[icle] 38.23 . . . are automatically invoked." *Id.*

At the hearing on the admissibility of DuBose's testimony, defense counsel informed the trial court:

> I can tell you all of our objections . . . . First and foremost, she was not licensed at the time, and in order to use RN, you must be licensed. A registered nurse who practices nursing after the expiration of her license is an illegal practitioner. In order to be a SANE examiner, you must have a license, which she did not at the time. She was not qualified to diagnose or treat. She did not do a physical exam. This was just simply an interview.

Counsel's explanation was sufficient to apprise the trial court and State that Koury was challenging the admission of DuBose's testimony in part because she was unlicensed at the time of the exam. *See Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009). Indeed, following counsel's argument, the trial judge clarified that he understood "the argument

regarding the license issue." Thus, we conclude that the issue was preserved for appellate review. *See* Tex. R. App. P. 33.1; *Polk*, 738 S.W.2d at 276.

Koury argues that Williams' statements to DuBose were obtained in violation of sections 301.251 and 301.301(b) of the Occupations Code because DuBose's nursing license was expired at the time of the SAFE. *See* Tex. Occ. Code §§ 301.251, .301(b). He asserts that the statements should therefore have been excluded under article 38.23(a). This argument is unavailing for two reasons.

First, Koury does not explain how the alleged violations of sections 301.251 and 301.301(b) violated his rights. He does not assert, nor does the record show, that Williams' treatment by an unlicensed nurse impacted *his* rights, and he therefore lacks standing to complain about any evidence seized as a result. *See Chavez*, 9 S.W.3d at 819. He likewise lacks standing insomuch as he challenges the admission of Williams' statements on the basis that they were obtained by violation of her rights. *See Neal*, 256 S.W.3d at 284.

Second, the licensing statutes are unrelated to the purposes of article 38.23(a). *See Wilson v. State*, 311 S.W.3d 452, 458–59 (Tex. Crim. App. 2010). As mentioned above, the article principally serves to protect the rights of criminal suspects from the unlawful collection of evidence in anticipation of trial. *See Carroll*, 911 S.W.2d at 221. By contrast, the Texas Supreme Court has characterized the "evident purpose" of the nursing statutes as ensuring "the medical competence and training of those persons serving as nurses in the State." *Dodd v. Meno*, 870 S.W.2d 4, 6 (Tex. 1994). And although the licensing requirements identified by Koury are not specific to SANEs, the purpose of a SAFE—contrary to his assertions—is medical treatment and diagnosis, not the procurement of evidence. *See Murray v. State*, 597 S.W.3d 964, 975 (Tex. App.—Austin 2020, pet. ref'd) (explaining that despite SANE's certification, SAFE "was for the

7

primary purpose of medical treatment"); *see also United States v. Barker*, 820 F.3d 167, 172 (5th Cir. 2016) (stating that "SANE['s] certification did not convert the essential purpose of her conversation with [alleged victim] from medical evaluation and treatment to evidence-collection, though it may have tended to lead to [defendant]'s prosecution" because "[l]ike all good nurses, [SANE] would have acted with the principal purpose to provide [alleged victim] with medical care—whether or not she possessed the SANE certification").

Thus, because sections 301.251 and 301.301(b) are unconcerned with securing a criminal suspect's rights against the gathering of evidence by law enforcement, violations of the statutes do not constitute violations of the law under article 38.23(a). *See Wilson*, 311 S.W.3d at 458–59; *see also Pannell v. State*, 666 S.W.2d 96, 98 (Tex. Crim. App. 1984) (determining that violations of Code of Professional Conduct are not laws contemplated by article 38.23); *Roy v. State*, 608 S.W.2d 645, 651–52 (Tex. Crim. App. 1980) (holding that assumed-name statute had no bearing on undercover police operation and that officer's failure to comply with statute did not invoke article 38.23); *Andrews v. State*, 296 S.W.2d 275, 276 (Tex. Crim. App. 1956) (finding that fact that physician who conducted vaginal examination of rape complainant was not licensed to practice in Texas did not invoke article 38.23(a) and render his testimony concerning exam's results inadmissible); *Stockton v. State*, 756 S.W.2d 873, 874 (Tex. App.—Austin 1988, no pet.) (concluding that article 38.23 did not apply to alleged violation of school-enrollment statute by undercover officer posing as high-school student because purposes served by statute were "wholly unrelated to the purposes of the exclusionary rule").

For these reasons, we overrule his first issue.

## III.    Reliability of Outcry Statements

In his second issue, Koury contends that the trial court abused its discretion by allowing Caraway to testify as an outcry witness[2] because Williams' statements to Caraway were not reliable.  *See* Tex. Code Crim. Proc. art. 38.072, § 2(b)(2).

Article 38.072 of the Code of Criminal Procedure, also known as the outcry statute, creates a hearsay exception in the prosecution of certain sexual offenses committed against children for the admission of an alleged victim's first outcry of sexual abuse to an adult. *Gibson v. State*, 595 S.W.3d 321, 326 (Tex. App.—Austin 2020, no pet.) (citing *Bays v. State*, 396 S.W.3d 580, 581 n.1 (Tex. Crim. App. 2013)).  For a statement to be admissible under article 38.072, the trial court must find, in a hearing conducted outside the jury's presence, that the statement is reliable based on its time, content, and circumstances.  Tex. Code Crim. Proc. art. 38.072, § 2(b)(2).  "The phrase 'time, content, and circumstances' refers to 'the time the child's statement was made to the outcry witness, the content of the child's statement, and the circumstances surrounding the making of that statement.'"  *Broderick v. State*, 89 S.W.3d 696, 699 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd) (quoting *MacGilfrey v. State*, 52 S.W.3d 918, 921 (Tex. App.—Beaumont 2001, no pet.)).  A trial court has "broad discretion" in admitting outcry-witness testimony, *Garcia v. State*, 792 S.W.2d 88, 92 (Tex. Crim. App. 1990), and "[n]either corroboration nor physical evidence is required for an outcry to be determined reliable," *Buentello v. State*, 512 S.W.3d 508, 519 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd) (citing *Gonzales v. State*, 477 S.W.3d 475, 479 (Tex. App.—Fort Worth 2015, pet. ref'd)).

---

[2] "[A]n outcry witness, under Code of Criminal Procedure art. 38.072, is the first adult to whom a child or disabled individual describes being the victim of certain crimes, including many sexual crimes." *Sanchez v. State*, 354 S.W.3d 476, 479 n.1 (Tex. Crim. App. 2011).

In reviewing reliability determinations, some courts of appeals have adopted eleven "indicia of reliability" initially formulated by our sister court in *Buckley v. State*:[3]

> (1) whether the victim testifies at the trial and admits making the out-of-court statement; (2) whether the child is of a level of maturity to understand the need to tell the truth and to have the ability to observe, recollect, and narrate; (3) whether the child's out-of-court statement is corroborated by other evidence; (4) whether the child's out-of-court statement was spontaneously made in the child's own terminology or whether there is evidence of prior prompting or manipulation by adults; (5) whether the child's out-of-court statement is clear and unambiguous and rises to the needed level of certainty; (6) whether the statement is consistent; (7) whether the statement describes an event that a child of his or her age could not be expected to fabricate; (8) whether there is abnormal behavior by the child after the contact; (9) whether there is a motive for the child to fabricate the out-of-court statement; (10) whether the statement is against the interest of the child, e.g., the child expects punishment because of reporting the conduct; and (11) whether there was an opportunity under the evidence for the alleged act to have been committed by the defendant.

*See* 758 S.W.2d 339, 343–44 (Tex. App.—Texarkana 1988), *aff'd*, 786 S.W.2d 357 (Tex. Crim. App. 1990); *see also Torres v. State*, 424 S.W.3d 245, 257 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd); *In re M.R.*, 243 S.W.3d 807, 813 (Tex. App.—Fort Worth 2007, no pet.); *Norris v. State*, 788 S.W.2d 65, 71 (Tex. App.—Dallas 1990, pet. ref'd). *But see Broderick*, 89 S.W.3d at 699 (stating that "[a]lthough courts have enumerated factors that may assist in ascertaining the reliability of an outcry statement, the focus of the inquiry must remain upon the outcry statement, not the abuse itself"); *Carty v. State*, 178 S.W.3d 297, 306–07 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) (finding that outcry statement was reliable without reference to *Buckley* indicia); *Jones v. State*, No. 10-13-00106-CR, 2014 WL 3556520, at *3–4 (Tex. App.—Waco July 3, 2014, pet. ref'd) (mem. op., not designated for publication) (specifically declining to use *Buckley* indicia).

---

[3] Both sides in the present case utilize the indicia as an analytical framework in their briefs.

This Court has never applied the indicia in a published opinion. Moreover, because they seemingly require inquiries into the circumstances of the abuse allegations themselves, the biases or credibility of an outcry witness, or evidence admitted following the trial court's ruling, they exceed the "exceptionally narrow" focus of an article 38.072 hearing and the reach of our appellate review. *See Sanchez v. State*, 354 S.W.3d 476, 487–88 (Tex. Crim. App. 2011); *Broderick*, 89 S.W.3d at 699 (finding that questions "focused on the circumstances of the abuse itself" were "outside the narrow scope of the inquiry into the time, circumstances, or content of the outcry statement"); *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000) (noting that "appellate court must review the trial court's ruling in light of what was before the trial court at the time the ruling was made"). We therefore confine our analysis to the statutory considerations listed in article 38.072. *See* Tex. Code Crim. Proc. art. 38.072, § 2(b)(2).

Caraway testified about the time, content, and circumstances of Williams' statements during the hearing on the admissibility of his outcry testimony. On March 28, 2020, Caraway, Williams, and two of their siblings spent the day barbecuing, fishing, and "all that good stuff." The children were staying with Caraway, and that night, after their siblings fell asleep, Williams "decided to just open up and tell [him] a lot of different things," including that Koury "had been touching her in her sleep along with taking videos of her while she's awake and sleeping." Caraway was "pretty shocked," and it "had been a very long day," so he asked her if they "could just go to sleep and talk about it in the morning." When she woke up the next day, they went to a boathouse on the property and talked "probably 16 hours straight."

Williams told him about "many instances [of abuse] over about four years" beginning when she was twelve and ending approximately "a couple of months before she came

11

to [his] house." During the first instance, Koury touched her on her vagina with his finger. On other occasions, he put his finger into and licked her "sexual organ."[4] She indicated that Caraway was the first adult she had told.

Following Caraway's testimony, defense counsel objected to the reliability of Williams' outcry. Specifically—referring to the eleven *Buckley* indicia—counsel argued that the statement was not spontaneous because it occurred over two days, that it was possible that Caraway had asked leading questions, that Caraway "may have motive to have manipulated the situation," that a 16 year old "is certainly quite . . . capable of fabricating" a story, and that Williams "might have had an incentive to fabricate."

In rebuttal, the State asserted that: (1) Williams was expected to testify and "will admit making the statement"; (2) the evidence would show that she understood the need to be truthful and had the ability to observe, recollect, and narrate; (3) her outcry was corroborated by her statements to DuBose and Corona, the forensic interviewer; (4) her outcry was spontaneous because Caraway testified that "it came out of nowhere and he was surprised"; (5) her outcry was clear and unambiguous; (6) no evidence had been presented that her outcry was fabricated; (7) she behaved abnormally after the outcry by running away; and (8) Koury had the opportunity to commit the alleged offense because Williams "stayed with him since she was in 3rd grade up to the point that she ma[de] the outcry." The State acknowledged that Williams had no expectation of punishment.

The evidence admitted at the article 38.072 hearing supports the trial court's finding that Williams' statements were reliable. Defense counsel's arguments were largely

---

[4] The term "sexual organ" was employed by the State. Although Caraway testified that Williams told him that Koury had touched her "[o]n her vagina," it is unclear whether the latter phrasing was Caraway's or Williams'.

speculative and inquired impermissibly into Caraway's biases and credibility. *See Bays v. State*, 396 S.W.3d 580, 590 (Tex. Crim. App. 2013) ("[T]he outcry statute merely requires that the statements be reliable and does not require that the outcry witness be neutral."); *Sanchez*, 354 S.W.3d at 488 ("[T]he credibility of the outcry witness is not a relevant issue at a hearing to determine admissibility of an outcry. . . . The outcry witness's biases may be such that a fact-finder would not believe the outcry statement as relayed by the witness, but that is not a matter that the legislature has given to the trial court's discretion."). While counsel also argued that the outcry's having been made over two days precluded its being spontaneous, we are unpersuaded. Additionally, to the extent that counsel was correct that a 16-year-old child is capable of fabricating sexual abuse allegations, we are unwilling to conclude that an alleged victim's age and capacity to lie—without more—is sufficient to render a statement unreliable. As the State recognized, although defense counsel argued that, "if need be," the defense could "put on evidence to show the reasons why [Williams] might have had an incentive to fabricate," no such evidence was presented at the hearing.

To the arguments made by defense counsel at the hearing, Koury on appeal adds that Williams testified that she could not remember what she had told Caraway, that her statement was not corroborated by trial evidence following the hearing, that evidence admitted after the hearing showed that she had motive to fabricate the statement, and that Williams testified that she did not behave abnormally after making the statement. These arguments, however, require us to consider evidence that was not before the trial court at the time of its ruling. *See Weatherred*, 15 S.W.3d at 542. Moreover, as noted above, a statement need not be corroborated to be reliable, and any inconsistency between a child's outcry and later trial testimony "'is a matter of credibility and goes to the weight of the evidence,' not the reliability of

13

the statement or its admissibility." *Buentello*, 512 S.W.3d at 519 (quoting *Marquez v. State*, 165 S.W.3d 741, 747 (Tex. App.—San Antonio 2005, pet. ref'd)).

For these reasons, the trial court did not abuse its discretion by allowing Caraway to testify about the outcry statements that Williams made to him. We overrule Koury's second issue.

## IV. "Backdoor Hearsay"

In his third issue, Koury contends that the trial court abused its discretion by admitting "backdoor hearsay" statements during the testimony of Corona, the forensic interviewer who interviewed Williams.

Hearsay is a statement, other than one made by the declarant while testifying at a trial, offered in evidence to prove the truth of the matter asserted. Tex. R. Evid. 801(d). Hearsay is generally inadmissible except as provided by the rules of evidence or statute. *Id.* R. 802. The hearsay prohibition cannot be circumvented by eliciting the substance of the statement in indirect form. *Schaffer v. State*, 777 S.W.2d 111, 113 (Tex. Crim. App. 1989). Such hearsay-by-inference, or "backdoor hearsay," violates the prohibition against hearsay because it "presents the content or substance, indirectly, of the out-of-court statement." *Cortes-Puga v. State*, No. 03-17-00713-CR, 2019 WL 3680135, at *8 (Tex. App.—Austin Aug. 7, 2019, pet. ref'd) (mem. op., not designated for publication). "Backdoor hearsay" is subject to the same rules and limitations as the more common form of hearsay. *See Schaffer*, 777 S.W.2d at 113.

The test for "backdoor hearsay" is whether the eliciting party's "'sole intent in pursuing [a] line of questioning was to convey to the jury' the contents of out-of-court statements." *Head v. State*, 4 S.W.3d 258, 262 (Tex. Crim. App. 1999) (quoting *Schaffer*,

777 S.W.2d at 114). In other words, "backdoor hearsay" exists where a reviewing court confronts the "inescapable conclusion that a piece of evidence is being offered to prove statements made outside the courtroom." *Schaffer*, 777 S.W.2d at 114. "An analysis of whether the impermissible inference is so overriding as to fall within the hearsay prohibition will necessarily turn on the specific factual circumstances of a given case." *Head*, 4 S.W.3d at 262 n.4.

During Corona's testimony, a bench conference was held at which defense counsel expressed concern that the State was attempting to elicit "backdoor hearsay" and argued that "[s]aying that [Williams] made an outcry would be hearsay." The State responded that it only intended to ask whether Corona interviewed Williams and "what he observed as far as her demeanor" but did not "plan to ask him directly what she said." When the parties continued to disagree, the trial court directed defense counsel to make her objection "[w]hen [the State] gets to that point." The following exchange then occurred:

Q. [(By the State)] Did she reveal specifics to you – and I don't want you to say what she said, but did she reveal specifics to you that you felt needed to be investigated?

DEFENSE COUNSEL: Objection, Your Honor, hearsay.

THE COURT: Overruled.

Q. (By [the State]) All right. You can answer.

A. What she mentioned during the forensic interview –

Q. Yeah. Let me – I don't want you to say it.

A. Uh-huh.

Q. Okay. I know that . . . this is difficult, right? Did she make an outcry during the interview?

15

DEFENSE COUNSEL: Objection, Your Honor, hearsay.

THE COURT: It's overruled.

A. She did make an outcry.

Q. (By [the State]) Okay. And, again, I'm not going to ask you to say anything she specifically told you. Did you suggest to her any of the answers during that outcry?

A. No.

Q. In your training as a forensic interviewer, are you trained to look for certain red flags when a child is describing things?

A. Yes.

Q. Describe – I think you and I know what I'm talking about. Would you tell the jury what I'm talking about when I say red flags?

A. Can I explain the semi-structured –

Q. Please do.

. . . .

Q. Okay. And so as the conversation is flowing, is this the same type of process you used for the interview with [Williams]?

A. Yes.

Q. Again, I do not want you to say anything she said. Was she able to give you specific details?

A. She was.

Q. Was she able to describe the position of bodies?

A. She was.

Q. Was she able to describe movement?

A. She was.

DEFENSE COUNSEL: I'm objecting again, Your Honor. If she was able to describe, that is hearsay. He is referring to statements that she made. That is substantive. That is hearsay. It's an out-of-court statement.

STATE: I'm going to the capabilities of what she was able to describe without any specifics of what was actually described. So it is not hearsay, Your Honor.

THE COURT: Objection is overruled. You may answer.

Q. (By [the State]) Go ahead. Was she able to describe the movement of people?

A. She was.

Q. Was she able to give sensory details?

A. She was.

Q. And when we say sensory details, what is a sensory – just stepping aside for a moment, a sensory detail? What is a sensory detail?

A. A sensory detail involves the five senses, feeling or touch, taste, hearing, smell. Those are sensory details.

On appeal, Koury appears to challenge much of this testimony, arguing that the State inquired into the presence of red flags to "show that [Williams'] statements elicited a valid concern in Corona that [she] was telling the truth and that the alleged sexual assault did happen," which was "done to prove the truth of the matter asserted by [Williams]." He also argues that the questions addressing "specific details," "the position of bodies," and "movement" were "designed to paint a picture of what [Williams] said without actually saying it." Lastly, he asserts that the State, by asking Corona whether Williams was able to describe the "movement of people" and to give "sensory details," was trying both to "paint a picture" and "to remind the jury of earlier testimony from Van Caraway."

First, we note that much of the challenged testimony was not objected to at trial and that with respect to this unobjected-to testimony, Koury has failed to preserve his issue for appellate review. *See* Tex. R. App. P. 33.1; *Williams v. State*, 662 S.W.3d 452, 460 (Tex. Crim. App. 2021). Requiring a timely, specific objection "informs the judge of the basis of the

17

objection and affords him an opportunity to rule on it" and "affords opposing counsel an opportunity to respond to the complaint." *Williams*, 662 S.W.3d at 460.

Defense counsel objected only to the State's asking Corona whether Williams "reveal[ed] specifics to [him] that [he] felt needed to be investigated," whether she made an outcry, and whether she was able to describe movement. The trial court overruled counsel's objections, thereby preserving Koury's arguments with respect to these questions on appeal. To the extent that he challenges the admission of other testimony, his argument is unpreserved. *Id.*

Corona's affirmative responses to the objected-to questions did not impliedly convey the content of Williams' interview statements. Indeed, the first, because it was not offered for the truth of the matter asserted, was not hearsay. *See Dinkins v. State*, 894 S.W.2d 330, 347 (Tex. Crim. App. 1995) ("An extrajudicial statement . . . which is offered for the purpose of showing *what* was said rather than for the *truth* of the matter stated therein does not constitute hearsay."); *see also Schaffer*, 777 S.W.2d at 114–15 (holding that it was permissible for police officer to testify that officer was acting in response to "information received," but officer was not permitted to relate historical aspects of case).

Corona's testimony that Williams described movement failed to convey any specific details of her allegations. The simple fact that the alleged sexual abuse involved movement is as devoid of inferable content as his testimony that she made an outcry or revealed specifics meriting further investigation. Because the testimony in no way conveyed Williams' description of the acts of sexual abuse perpetrated against her, we are unable to conclude that the State's sole intent in offering it was to convey the content of her out-of-court statements. *See Head*, 4 S.W.3d at 262. Moreover, the fact that the State anticipated that Williams would testify at trial suggested that proving the contents of her statements to Corona was not its sole intent in

18

offering his testimony. *See Gurka v. State*, 82 S.W.3d 416, 422 (Tex. App.—Austin 2002, pet. ref'd) ("[T]he fact that the jury had already heard C.B.'s testimony weakens Gurka's contention that the State's sole intent in questioning the cousin and the friend was to prove the contents of C.B.'s statements.").

Alternatively, even had the trial court abused its discretion by admitting Corona's testimony, the error is not reversible. *See Cook v. State*, 665 S.W.3d 595, 600 (Tex. Crim. App. 2023) ("The erroneous admission of evidence 'will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling.'" (quoting *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998))). Following Corona's testimony, Williams herself testified without objection that Koury sexually abused her over a period of approximately four years; that she made an outcry to Caraway; and that she remembered going to the CAC, talking to someone, and participating in a forensic interview. *See Gurka*, 82 S.W.3d at 421 ("Even if Gurka had preserved error as to either Reanell or Brittany's testimony, their testimony did not convey any new facts to the jury. C.B. had already testified that she told Reanell and Brittany that Gurka had molested her."). Thus, to the extent that the trial court abused its discretion by admitting Corona's testimony, the error was harmless.

For these reasons, we overrule Koury's third issue.

## CONCLUSION

Having overruled each of Koury's issues, we affirm the trial court's judgment of conviction.

_____

Rosa Lopez Theofanis, Justice

Before Chief Justice Byrne, Justices Kelly and Theofanis

Affirmed

Filed:   January 30, 2024

Publish